MCDERMOTT WILL & EMERY LLP
WILLIAM G. GAEDE, III (136184)
wgaede@mwe.com
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
Telephone:      (650) 815-7400
Facsimile:      (650) 815-7401

MCDERMOTT WILL & EMERY LLP
JOSEPH R. ROBINSON (*Pro Hac Vice*)
jrobinson@mwe.com
HEATHER MOREHOUSE ETTINGER (*Pro Hac Vice*)
Hettinger@mwe.com
SARIKA SINGH (*Pro Hac Vice*)
ssingh@mwe.com
340 Madison Avenue
New York, NY 10173
Telephone:      (212) 547-5509
Facsimile:      (212) 547-5444

*Attorneys for Plaintiffs Shire LLC, Supernus
Pharmaceuticals, Amy F.T. Arnsten, Ph.D.,
Pasko Racik, M.D., and Robert D. Hunt, M.D.*

WIGGIN AND DANA LLP
JOSEPH V. SAPHIA
jsaphia@wiggin.com
450 Lexington Avenue
38th Floor
New York, NY 10017
Telephone: (212) 490-1700
Facsimile: (212) 490-0536

*Attorneys for Plaintiffs Amy F.T. Arnsten, Ph.D.,
Pasko Racik, M.D., and Robert D. Hunt, M.D.*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SHIRE LLC, SUPERNUS PHARMACEUTICALS, INC., AMY F.T. ARNSTEN, PH.D., PASKO RAKIC, M.D., and ROBERT D. HUNT, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> IMPAX LABORATORIES, INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC.–FLORIDA, WATSON PHARMA, INC., and ANDA, INC., <br><br> Defendants. | No.  10-CV-05467 RS (MEJ) <br><br> **PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF** <br><br><br> **Date:**       **May 30, 2012** <br> **Time:**       **10:00 AM** <br> **Courtroom**  **3, 17th Floor** <br> **Judge:**      **Hon. Richard Seeborg** |

1

**TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION ................................................................................................. 1

4    II.   BACKGROUND ................................................................................................. 4

5          A.    The Inventions of the Shire Patents ......................................................... 4
           B.    The Asserted Claims of the Shire Patents ................................................ 5

6    III.  THE LAW OF CLAIM CONSTRUCTION ...................................................... 5

7    IV.   THE DISPUTED TERMS OF THE SHIRE PATENTS .................................... 8

8          A.    "Non-pH Dependent Sustained Release Agent" ....................................... 8
                 1.    "Non-pH Dependent Sustained Release Agent" Should Be
9                      Construed as Describing Components When Actually Formulated,
                       Not When Isolated ......................................................................... 8
10               2.    "Non-pH Dependent" Should Be Construed as Regardless of
                       Gastrointestinal pH, Not Regardless of an Abstract pH ................ 9
11               3.    "Sustained Release" Has a Special Meaning in the Pharmaceutical
                       Formulation Field ......................................................................... 10
12               4.    The Interpretation of This Claim Term Should Not Include an
                       Exemplary List of Suitable Components, as Impax Proposes ...... 11
13         B.    "pH Dependent Agent That Increases the Rate of Release of Said at Least
                 One Pharmaceutically Active Agent From the Tablet at a pH in Excess of
14               5.5" ......................................................................................................... 11
                 1.    "pH Dependent Agent That Increases the Rate of Release of Said at
15                     Least One Pharmaceutically Active Agent From the Tablet at a pH
                       in Excess of 5.5" Should Also Be Construed as Describing
16                     Components When Actually Formulated, Not When Isolated ........ 12
                 2.    This Plain Language of the Claim Term Includes Its Own Express
17                     pH Parameters, Which Compare With Either (i) An Environment
                       Having a pH of 5.5 or Less, or (ii) When the Composition is
18                     Formulated Without the pH Dependent Agent ............................. 12
           C.    "Polymer That Swells at a pH in Excess of 5.5" ..................................... 13
19               1.    "Polymer That Swells at a pH in Excess of 5.5" Should Also Be
                       Construed as Describing Components When Actually Formulated,
20                     Not When Isolated ....................................................................... 14
                 2.    "Polymer" is a Scientific Term With a Dictionary Definition ...... 14
21               3.    The Plain Language of the Claim Provides the pH Range ............. 14
                 4.    The Interpretation of This Claim Term Should Not Include an
22                     Exemplary List of Suitable Components, as Impax Proposes ...... 14
           D.    "Agent That Increases the Solubility of Said Pharmaceutically Active
23               Agent at a pH Greater Than 5.5" ........................................................... 15
                 1.    "Agent that Increases Solubility of Said Pharmaceutically Active
24                     Agent at a pH Greater than 5.5" Should Also Be Construed as
                       Describing Components When Actually Formulated, Not When
25                     Isolated ....................................................................................... 16
                 2.    The Plain Language of the Claim Term Includes Its Own Express
26                     pH Parameters Which Must Compare With Either (i) an
                       Environment Having a pH of 5.5 or Less, or (ii) When the
27                     Composition is Formulated Without the pH-Dependent Agent ...... 16
                 3.    Common Meaning and the Patent Explain That "Solubility" is
28                     Dissolution ................................................................................. 17

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

**TABLE OF CONTENTS**
**(continued)**

Page

    4.    The Interpretation of This Claim Term Should Not Include an
Exemplary List of Suitable Components, as Impax Proposes .................. 17

E.    "Reducing the Likelihood of Side Effects Associated With the
Administration of Guanfacine" ................................................................................ 18

    1.    The Common Meaning of "Likelihood" is Probability ............................. 18

V.    CONCLUSION ................................................................................................................ 19

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

# TABLE OF AUTHORITIES

**Page**

CASES

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*
512 F.3d 1338 (Fed. Cir. 2008) ............................................................................................. 7

*CVI/Beta Ventures, Inc. v. Tura LP*
112 F.3d 1146 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 1109 (1998) .................................... 6

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*
849 F.2d 1430 (Fed. Cir. 1988), *cert. denied*, 488 U.S. 986 (1988) ...................................... 7

*Hoechst Celanese Corp. v. BP Chems. Ltd.*
78 F.3d 1575 (Fed. Cir. 1996) ............................................................................................. 6

*Hoganas AB v. Dresser Indus., Inc.*
9 F.3d 948 (Fed. Cir. 1993) ............................................................................................... 7

*Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*
309 F.3d 1365 (Fed. Cir. 2002) ........................................................................................... 8

*Key Pharm. v. Hercon Labs. Corp.*
161 F.3d 709 (Fed. Cir. 1998) .......................................................................................... 6, 7

Liebel-Flarsheim Co. v. Medrad, Inc.
358 F.3d 898 (Fed. Cir. 2004) ............................................................................. 7, 11, 15, 17

*Markman v. Westview Instruments, Inc.*
517 U.S. 370 (1996) ............................................................................................... passim

*Pall Corp. v. Hemasure Inc.*
181 F.3d 1305 (Fed. Cir. 1999) ........................................................................................... 6

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... 7, 11, 15, 17

Prima Tek II, LLC v. Polypap S.A.R.L.
*318 F.3d 1143 (Fed. Cir. 2003)* ......................................................................... 7, 11, 15, 17

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*
242 F.3d 1337 (Fed. Cir. 2001) ........................................................................................... 7

*Seymour v. Osbourne*
78 U.S. 516 (1871) ........................................................................................................... 7

*Shire LLC et al. v. Teva Pharm.*
No. 10-329-RGA (D. Del., April 22, 2010) ........................................................................... 2

*Southwall Techs,. Inc. v. Cardinal IG Co.*
54 F.3d 1570 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 987 (1995) ....................................... 8

*Superguide Corp. v. DirectTV Enters., Inc.*
358 F.3d 870 (Fed. Cir. 2004) ............................................................................................. 7

*Tex. Digital Sys., Inc. v, Telegenix, Inc.*
308 F.3d 1193 (Fed. Cir. 2002) ........................................................................................... 7

*Unique Concepts, Inc. v. Brown*
939 F.2d 1558 (Fed. Cir. 1991) ........................................................................................... 8

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

- iii -

**TABLE OF AUTHORITIES**
(continued)

Page

*Vitronics v. Conceptronic, Inc.*
   90 F.3d 1576 (Fed. Cir. 1996) .................................................................................. 6, 7

**STATUTES**

21 U.S.C. § 355(j) ................................................................................................................ 1

35 U.S.C. § 271 ................................................................................................................... 1

**OTHER AUTHORITIES**

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1994) ................................. 17

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2002) ................................. 18

MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY (Merriam-Webster, Inc. 1996) .................. 10

POLYMER SCIENCE DICTIONARY
   Mark S.M. Alger ed., Elsevier Science Publishers 1989 ...................................... 14

REMINGTON'S PHARMACEUTICAL SCIENCES
   Gennaro Ed., Mack Publishing Co. 1990 ............................................................... 10

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

## I.  INTRODUCTION

This is a patent infringement action under the Hatch-Waxman Act.  21 U.S.C. § 355(j); 35 U.S.C. § 271.  Plaintiffs (collectively, "Shire") own or are the exclusive licensee of two current U.S. patents:  U.S. Patent Nos. 6,287,599 (the "'599 patent") (Declaration of Heather Morehouse Ettinger in Support of Plaintiffs' Opening Claim Construction Brief ("Ettinger Decl."), Exh. 1) and 6,811,794 (the "'794 patent") (Ettinger Decl., Exh. 2) (collectively, the "Shire patents").[1] The Shire patents cover the drug Intuniv® and its use and provide Shire with patent exclusivity through July 4, 2022.  A Shire subsidiary also holds an approved New Drug Application ("NDA") from the U.S. Food and Drug Administration ("FDA") that gives Plaintiff Shire LLC the sole authorization to market Intuniv in the U.S. The Shire patents are listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book") as covering Intuniv.  Intuniv is indicated for the treatment of Attention Deficit Hyperactivity Disorder ("ADHD").

Impax Laboratories, Inc. ("Impax") and Watson Laboratories, Inc.–Florida have each filed independent short-cut applications (*i.e.*, Abbreviated New Drug Applications or "ANDAs") with the FDA for authorization to market generic versions of Intuniv before the expiration of the Shire patents.  Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Anda, Inc. (collectively with Watson Laboratories, Inc.–Florida, "Watson") are also parties in this lawsuit since they will be involved in the manufacture and marketing of the Watson product.  This suit seeks to require Impax and Watson (collectively, "Defendants") to honor the Shire patents and to refrain from selling copycat Intuniv until the Shire patents expire.

---

[1] U.S. Patent No. 5,854,290 (the "'290 patent"; Ettinger Decl., Exh. 3) was originally asserted in this case, as well.  However, the '290 patent was dedicated to the public on March 22, 2012. Ettinger Decl., Exh. 4.  In light of the dedication to the public and in the interests of judicial economy, Plaintiffs believe that it is no longer necessary for the Court to construe any of the terms of the '290 patent.  Accordingly, Plaintiffs do not brief the construction of any '290 patent claim terms.  Rather, Plaintiffs list their proposed construction of the formerly disputed '290 patent claim terms and provide citations in support thereof in Appendix 1.  If the Court determines that any claim terms in the '290 patent still must be construed despite the dedication of the patent to the public, Plaintiffs will request leave of the Court to supplement this brief accordingly.

1  The asserted claims of the '559 patent are directed to pharmaceutical compositions that

2  encompass Intuniv. The '794 patent asserted claims are directed to methods of treating ADHD or

3  of reducing the likelihood of side effects associated with the active pharmaceutical ingredient

4  ("API") in Intuniv—guanfacine.

5  The Court is now construing the scope and meaning of the Intuniv claims as a prerequisite

6  to litigating infringement and validity.[2]  Shire and Defendants have agreed[3] on five "most

7  significant" terms and on four additional terms that need to be construed.  Shire submits, with

8  respect to the five most significant claim terms, that:

9  (1) "non-pH dependent sustained release agent" (first appearing in '599 patent claim 1)

10  means a substance that, when the claimed composition is formulated (*i.e.*, in the formulation),

11  slows release of the active agent (*i.e.*, drug) from the composition over an extended period of time

12  regardless of gastrointestinal pH;

13  (2) "pH dependent agent that increases the rate of release of said at least one

14  pharmaceutically active agent from the tablet at a pH in excess of 5.5" (first appearing in '599

15  patent claim 1) means a substance that, when the claimed composition is formulated (*i.e.*, in the

16  formulation), increases the rate of release of the active agent (*i.e.*, drug) from the composition in

17  an environment having a pH above 5.5, over (*i.e.*, as compared to) when the composition is either

18  (i) in an environment having a pH of 5.5 or less, or (ii) when the composition is formulated

19  without the pH dependent agent;

20  (3) "polymer that swells at a pH in excess of 5.5" (first appearing in '599 patent claim 2)

21  means a molecule with many units joined to each other through chemical covalent bonds, often in

22

23

24  [2] The United States District Court of Delaware, in concurrent litigation *Shire LLC et al. v. Teva Pharm.*, No. 10-329-RGA (D. Del. filed April 22, 2010), issued a claim construction ruling
25  construing several of the claim terms also at issue in this case. *See* Ettinger Decl., Exh. 5. The proposed constructions and arguments of all parties before this Court are not necessarily identical
26  to those that were before the Delaware court. Furthermore, the constructions of the Delaware court are not binding upon the parties in this case or upon this Court. Accordingly, Shire requests
27  this Court to construe the claim terms in this litigation based upon the briefings in this case.
[3] Shire and Defendants have also agreed that any claim term that appears in the claims of both the
28  '599 and '794 patents should have the same meaning in each patent.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

PLAINTIFF'S OPENING
CLAIM CONSTRUCTION BRIEF
CASE NO. 10-CV-05467 RS (MEJ)

a repeating manner, which, when the claimed composition is formulated (*i.e.*, in the formulation), expands at a pH above 5.5;

(4) "agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5" (first appearing in '599 patent claim 4) means a substance that, when the claimed composition is formulated (*i.e.*, in the formulation), increases the amount of the active agent (*i.e.*, drug) that dissolves in another substance in an environment having a pH above 5.5, over (*i.e.*, as compared to) when the composition is either (i) in an environment having a pH of 5.5 or less, or (ii) when the composition is formulated without the agent that increases the amount of the active agent (*i.e.*, drug) that dissolves in another substance; and

(5) "reducing the likelihood of side effects" (first appearing in '794 patent claim 8) means reducing the probability of side effects resulting from guanfacine administration.

Shire submits, with respect to the four less important claim terms, that they should be interpreted according to their ordinary meanings without any non-limiting exemplification language, as follows:

(6) "agent that maintains an acidic microenvironment in the composition" (first appearing in '599 patent claim 13) means a substance that keeps acidic, over a period of time, the environment immediately around or in close proximity to the active agent (*i.e.*, drug) inside of the composition;

(7) "binding agent" (first appearing in '599 patent claim 15) means a substance that aids in the binding of ingredients in a tablet;

(8) "an amount effective to treat said attention deficit disorder or attention deficit with hyperactivity disorder in said patient" (first appearing in '794 patent claim 3) means an amount of the composition sufficient to eliminate or reduce one or more symptoms of attention deficit disorder or attention deficit with hyperactivity disorder, whether during a single application of the amount or repeated applications; and

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

(9) "a therapeutically effective amount of a the position [sic, composition]" (first appearing in '794 patent claim 8) means an amount of the composition effective to improve an undesirable condition.

Shire and Defendants have agreed upon the construction of the remaining claim terms and they do not require interpretation by the Court.

Shire's proposed constructions are supported by, and are consistent with, the plain meanings of these terms in the context of the claimed inventions, the intrinsic evidence, and the acceptable extrinsic evidence. They do not read extraneous limitations into the claim terms from the patent specifications or add unnecessary surplusage such as non-limiting exemplification, as do Defendants' proposed constructions. Rather, they provide the necessary clarification as to the scope of what is included in the claimed compositions, what is administered in the claimed methods, and what effect is achieved in the claimed methods.

## II. BACKGROUND

### A. THE INVENTIONS OF THE SHIRE PATENTS

Intuniv is an orally-administered sustained release tablet formulation of the API guanfacine. The guanfacine is slowly absorbed into the bloodstream over an extended period of time as the drug travels along the gastrointestinal ("GI") tract, which includes the stomach and the intestines. Sustained release allows for less frequent dosing, which avoids spikes in guanfacine blood levels and leads to better patient compliance.

Different parts of the GI tract have different pHs (*i.e.*, different degrees of acidity or alkalinity on a scale ranging from 1 to 14). For example, the stomach is highly acidic (*i.e.*, pH around 1.0), while the small intestine, in its different regions, ranges from mildly acidic (*i.e.*, pH around about 5.5) to neutral (*i.e.*, pH about 7.0) to mildly alkaline (*i.e.*, pH up to about 7.4). Since the Intuniv tablet is designed to release guanfacine relatively evenly over much of the period that it travels along the GI tract (*i.e.*, sustained release as opposed to immediate release), it is formulated to release guanfacine independent of the pH of its environment. This is difficult to achieve with drugs such as guanfacine that have a pH dependent solubility profile. Guanfacine tends to dissolve most readily in highly acidic environments, but less readily in less acidic or

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

alkaline environments.  (*See* Ettinger Decl., Exh. 1, col. 1, ll. 40-48.)  Consequently, absent the correct formulation, guanfacine would be entirely dissolved from a tablet while still in the stomach (*i.e.*, immediate release), leaving little or no guanfacine to be released later in the intestines.  In other words, a great deal of Intuniv's success is because it is the first formulation of guanfacine that is a "pharmaceutical composition[] having a pH-independent or a minimized pH-dependent dissolution profile."  (Ettinger Decl., Exh. 1, col. 1, ll. 6-8.)

Guanfacine, prior to Shire's Intuniv product, had been sold by another pharmaceutical company in an immediate release formulation, called Tenex®, for the treatment of hypertension. However, Tenex was ineffective in comparison to other hypertension drugs and was associated with various side effects that limited its suitability for some patients.  For example, guanfacine was known to cause headaches, asthenia, drowsiness, sleepiness, dizziness, heart rhythm disturbances, nausea, abdominal pain, infection, and vomiting.  (Ettinger Decl., Exh. 2, col. 3, ll. 54-65.)  Shire's patented formulation, in addition to its sustained release of guanfacine, also reduces the probability of a patient suffering from guanfacine's side effects.

### B.   THE ASSERTED CLAIMS OF THE SHIRE PATENTS

The '599 and '794 patents are both entitled "Sustained Release Pharmaceutical Dosage Forms with Minimized pH Dependent Dissolution Profiles."  The asserted claims of the '599 patent claim precisely that—unique formulations that provide sustained release of the appropriate amounts of guanfacine throughout gastrointestinal pH.

The asserted claims of the '794 patent claim methods for treating ADHD or for reducing the likelihood (*i.e.*, probability, as opposed to number) of side effects associated with guanfacine therapy.  The methods both rely on administering unique formulations that provide sustained release of the appropriate amounts of guanfacine throughout gastrointestinal pH.

## III.   THE LAW OF CLAIM CONSTRUCTION

The function of a patent claim is to point out particularly and to claim distinctly what the applicants regard as their invention.  35 U.S.C. § 112.  The reason for this is two-fold: (1) to secure to the patentee all to which she is entitled, and (2) to inform the public of what is still open to them. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

Claim interpretation is a question of law, *Markman*, 517 U.S. at 390, and in that sense, is no different than interpretation of written legal documents in general. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 978-79 (Fed. Cir. 1995). In claim construction, "the court establishes the scope and limits of the claim, interprets any technical or other terms whose meaning is at issue, and thereby defines the claim with greater precision than had the patentee." *Pall Corp. v. Hemasure Inc*., 181 F.3d 1305, 1308 (Fed. Cir. 1999).

When construing a claim, one should look first to the intrinsic evidence of record, *i.e.*, the patent itself including the claims, the specification, and the prosecution history. *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1152 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 1109 (1998).[4] This evidence "is the most significant source of the legally operative meaning of disputed claim language." *Vitronics v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). If the public record clearly establishes the claim meaning, the inquiry is complete. *Id*. at 1583.

The words of the claim are given their ordinary meaning to one skilled in the art unless it appears from the patent and file history that the words were used differently by the inventors. *Id*. at 1582. "A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the invention used the term with a different meaning." *Id*. (quoting *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)). "The specification acts as a dictionary when it defines terms used in the claims or when it defines terms by implication." *Id*. When the specification is acting as a dictionary, expressly defining a term used in the claims, it is "the single best guide to the meaning of the disputed term . . . ." *Id*.

A court may receive extrinsic evidence to educate itself about the underlying technology. *Key Pharm. v. Hercon Labs. Corp*., 161 F.3d 709, 716 (Fed. Cir. 1998). A court may consider evidence such as dictionaries to "explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Markman*, 52 F.3d at 980.

---

[4] There was no substantive prosecution of either the '599 or '794 patents. Only formal or double-patenting rejections were made. Therefore, the prosecution histories of the patents do not inform the claim construction inquiry, here.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1   Evidence of this kind is often appropriate to ascertain the meaning of a technical or scientific

2   term, so that the court may be aided in understanding what the patent actually says. *Id*. at 980-

3   981. Such evidence can also aid the court in coming to a correct conclusion as to the true

4   meaning of the language in the patent. *Id*. at 980 (citing *Seymour v. Osbourne*, 78 U.S. 516, 546

5   (1871)). Dictionary definitions may also provide a basis for determining the ordinary meaning of

6   a disputed term. *Vitronics*, 90 F.3d. at 1584, n.6; *Tex. Digital Sys., Inc. v, Telegenix, Inc.*, 308

7   F.3d 1193, 1202 (Fed. Cir. 2002); *Superguide Corp. v. DirectTV Enters., Inc.*, 358 F.3d 870, 875

8   (Fed. Cir. 2004). A court must take care not to use the extrinsic evidence to arrive at a claim

9   construction that is inconsistent with a construction that is mandated by the intrinsic evidence,

10  however. *Key Pharm.*, 161 F.3d at 716.

11        Although the specification is used to interpret a claim, it cannot be used to add extraneous

12  limitations into a claim. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed.

13  Cir. 2008). "[O]ne of the cardinal sins of patent law [is] reading a limitation from the written

14  description into the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005)

15  (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed.

16  Cir. 2001).) Extraneous limitations are those that would be added into a claim from the

17  specification "wholly apart from any need to interpret what the patentee meant by particular

18  words and phrases" in the claims. *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir.

19  1993) (quoting *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433

20  (Fed. Cir. 1988), *cert. denied*, 488 U.S. 986 (1988)).

21        Additionally, particular embodiments of a patent and exemplification language should not

22  be read into a claim absent a clear intent by the inventor to limit the invention accordingly. *See*

23  *Phillips,* 415 F.3d at 1323; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir.

24  2004); *Prima Tek II, LLC v. Polypap S.A.R.L.*, 318 F.3d 1143, 1151 (Fed. Cir. 2003). A court

25  must distinguish between words that are intended to restrict the invention to a specific

26  embodiment and words that merely exemplify how to practice an invention such as "including,

27  but not limited to" language. *Phillips,* 415 F.3d at 1323.

28

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1  Once the proper meaning of a term used in a claim has been discerned, that term must

2  have the same meaning for all claims in which it appears.  *Inverness Med. Switzerland GmbH v.*

3  *Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002); *Southwall Techs,. Inc. v.*

4  *Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 987 (1995) (a claim

5  term "cannot be interpreted differently in different claims; *see also Unique Concepts, Inc. v.*

6  *Brown*, 939 F.2d 1558, 1562-63 (Fed. Cir. 1991) (claims may not be construed one way to obtain

7  their allowance and then a different way against accused infringers).

8  **IV.  THE DISPUTED TERMS OF THE SHIRE PATENTS**

9  **A.  "Non-pH Dependent Sustained Release Agent"**

10  The term "non-pH dependent sustained release agent" should be construed as meaning a

11  substance that, when the claimed composition is formulated (*i.e.*, in the formulation), slows

12  release of the active agent (*i.e.*, drug) from the composition over an extended period of time

13  regardless of gastrointestinal pH. This term first appears in '599 patent claim 1, which reads as

14  follows (emphasis added):

15  1. A pharmaceutical composition, comprising: (a) at least one pharmaceutically
active agent that is pH dependent; (b) at least one **non-pH dependent sustained**
16  **release agent**; and (c) at least one **pH dependent agent that increases the rate**
**of release of said at least one pharmaceutically active agent from the tablet at**
17  **a pH in excess of 5.5.**[5]

18  **1.  "Non-pH Dependent Sustained Release Agent" Should Be Construed**
**as Describing Components When Actually Formulated, Not When**
19  **Isolated**

20  The field of the invention claimed in the '599 patent is the pharmaceutical science of drug

21  formulation, and the patent is directed to:

22  particularly, . . . pharmaceutical compositions having a pH-independent or a
minimized pH-dependent dissolution profile. In particular, such composition
23  includes at least one pharmaceutically active agent that has a pH dependent
solubility profile, at least one non-pH-dependent sustained release agent, and at
24  least one pH-dependent agent that increases the dissolution rate of the at least one
pharmaceutically active agent at a pH in excess of 5.5.

25

26

27

28  [5] Ettinger Decl., Exh. 1.

(Ettinger Decl., Exh. 1, col. 1, ll. 5-14, 30.)  Whether a particular component is acting in a pH-dependent or in a pH-independent manner must be answered when that component is formulated.  The '599 patent claims pharmaceutical formulations, not isolated components, and the properties or effects of a single component can change from pH-dependent to pH-independent, depending on its amount, its environment, and on the other components of the formulation.

This is clearly shown in the '599 patent where several of the same components listed as suitable non-pH dependent sustained release agents are also listed as suitable pH dependent agents.  For example, the '599 patent lists carregeenan, sodium carboxymethyl cellulose, alginic acid, and an alginic acid salts (*i.e.,* alginates) as non-pH dependent sustained release agents (Ettinger Decl., Exh. 1, col. 1, ll. 58-67); but also lists these same components as pH-dependent agents.  (*Id.* at col. 2, ll. 19-22; *see also* Ettinger Decl., Exh. 2, col. 1, ll. 58-67; col. 2, ll. 19-22.)

Therefore, within the field of the '599 patent, the '599 patent specification and the language of the claims themselves provide that the property of being a non-pH dependent sustained release agent must be evaluated "when the claimed composition is formulated (*i.e.*, in the formulation)," not when the components are isolated apart from one another.

### 2.    "Non-pH Dependent" Should Be Construed as Regardless of Gastrointestinal pH, Not Regardless of an Abstract pH

The anatomical environment to which the '599 patent formulations are targeted is clearly the GI tract.  The active agents that are the subject of the '599 patent are those that have "a solubility profile wherein the active agent(s) is (are) more soluble in an acidic medium than in a basic medium" (Ettinger Decl., Exh. 1, col. 1, ll. 14-16), and the object of the claimed invention is to minimize the effects of varying gastrointestinal pH by making a composition that has a minimized pH-dependent or a pH-independent dissolution profile.  (Ettinger Decl., Exh. 1, col. 1, ll. 28-30.)  Finally, the patent explains that a problem with earlier compressed matrix tablet formulations of basic drugs, such as guanfacine, is that they give "a faster dissolution profile in simulated gastric fluid, having a pH of about 1.0, than in simulated intestinal fluid (pH 6.8 to 7.4)."  (Ettinger Decl., Exh. 1, col. 1, ll. 24-27.)

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1   Therefore, within the field of the '599 patent, the '599 patent specification provides that

2   the property of being a non-pH dependent sustained release agent must be assessed with respect

3   to gastrointestinal pH, not at some other pHs that are irrelevant to the invention.  Accordingly,

4   non-pH dependent must mean "regardless of gastrointestinal pH."

5        **3.    "Sustained Release" Has a Special Meaning in the Pharmaceutical**

6        **Formulation Field**

7   REMINGTON'S PHARMACEUTICAL SCIENCES (Gennaro Ed., Mack Publishing Co. 1990)

8   ("Remington's") is a leading textbook and reference for pharmacists, physicians and other

9   practitioners of the pharmaceutical and medical sciences.  It is the type of extrinsic evidence that

10  this Court should consider, as it explains the scientific principle and the meaning of the technical

11  term "sustained release."  *See Markman*, 52 F.3d at 981.  It defines the term "sustained release" as

12  slowing the release of drug (*i.e.*, the active agent) over an extended period of time.  (Ettinger

13  Decl., Exh. 6, p. 1677.)  *See also* MERRIAM-WEBSTER'S MEDICAL DESK DICTIONARY 790

14  (Merriam-Webster, Inc. 1996) ("[s]ustained release [means] designed to slowly release a drug in

15  the body over an extended period of time.").  (Ettinger Decl., Exh. 7.)

16  This definition is consistent with the '599 patent specification examples.  Guanfacine

17  formulations within (*see* Ettinger Decl., Exh. 1, Table 1, formulations PD-0052-28B, PD0052-

18  32B, PD-0052-32D, PD-0052-39A) and outside of (*i.e.,* controls) (*see* Ettinger Decl., Exh. 1, Table

19  1, formulations PD-0052-22A, PD-0052-25B) the scope of the patent claims were prepared and

20  tested in '599 patent Example 1.  Each sample was tested for dissolution over 12 hours under a

21  pH that simulated stomach pH (*i.e.*, pH 1.2 (*see* Ettinger Decl., Exh. 1, col. 1, ll. 25-26)) and

22  under a pH that simulated the intestines (*i.e.*, pH 6.8).  (*See* Ettinger Decl., Exh. 1, col. 1, ll. 26-

23  27; Exh. 1, Table 2.)   The controls did not release most of their formulated active agent,

24  guanfacine, over the entire 12 hours at both pHs, while those made according to the '599 patent

25  did.  (*Id.*)  The controls released about 100% of the active agent after 12 hours at pH 1.2, but only

26  released 61% or 25% of the active agent after 12 hours at pH 6.8, which means that the control

27  formulations did not give sustained release (*i.e.*, slow release over an extended period of time) of

28  the active agent independent of pH.  (*Id.*)   The formulations according to the '599 patent

**PLAINTIFF'S OPENING**
**CLAIM CONSTRUCTION BRIEF**
**CASE NO. 10-CV-05467 RS (MEJ)**

invention released about 100% of the active agent after 12 hours at pH 1.2 and after 12 hours at pH 6.8, which means that the formulation of the present invention sustained release (*i.e.*, slow release over an extended period of time) of the active agent independent of pH. (*Id.*)

#### 4. The Interpretation of This Claim Term Should Not Include an Exemplary List of Suitable Components, as Impax Proposes

It is unnecessary to list, in the interpretation of this claim term, examples of non-pH-dependent sustained release agents, as Impax proposes. One cannot point to any intention by the inventors to limit their invention accordingly. *See Phillips,* 415 F.3d at 1323 (Fed. Cir. 2005); *Liebel-Flarsheim*, 358 F.3d at 906; *Prima Tek II*, 318 F.3d at 1151. Such language would only be examples of how to practice an invention, such as "including, but not limited to" language. *Phillips,* 415 F.3d at 1323.

*Accordingly, "non-pH dependent sustained release agent" should be construed to mean a substance that, when the claimed composition is formulated (i.e., in the formulation), slows release of the active agent (i.e., drug) from the composition over an extended period of time regardless of gastrointestinal pH.*

#### B. "pH DEPENDENT AGENT THAT INCREASES THE RATE OF RELEASE OF SAID AT LEAST ONE PHARMACEUTICALLY ACTIVE AGENT FROM THE TABLET AT A pH IN EXCESS OF 5.5"

The term "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5" (first appearing in '599 patent claim 1) should be construed as meaning a substance that, when the claimed composition is formulated (*i.e.*, in the formulation), increases the rate of release of the active agent (*i.e.*, drug) from the composition in an environment having a pH above 5.5, over (*i.e.*, as compared to) when the composition is either (i) in an environment having a pH of 5.5 or less, or (ii) when the composition is formulated without the pH-dependent agent.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1. **"pH Dependent Agent That Increases the Rate of Release of Said at Least One Pharmaceutically Active Agent From the Tablet at a pH in Excess of 5.5" Should Also Be Construed as Describing Components When Actually Formulated, Not When Isolated**

Again, the field of the invention claimed in the '599 patent is the pharmaceutical science of drug formulation. (*See* Ettinger Decl., Exh. 1, col. 1, ll. 5-14, 28-30.) The '599 patent is directed to pharmaceutical formulations, not to isolated components, and the properties of these various components, when in the formulation, vary, as explained above in Section IV.A.1. This is clearly shown in the '599 patent where several of the same components listed as suitable non-pH-dependent sustained release agents are also listed as suitable pH-dependent agents. (*See, e.g.*, Ettinger Decl., Exh. 1, col. 1, ll. 58-67; col. 2, ll. 19-22; *see also* Exh. 2, col. 1, ll. 58-67; col. 2, ll. 19-22.)

Therefore, within the field of the '599 patent, the '599 patent specification and the language of the claims themselves provide that the property of being pH-dependent must also be evaluated "when the claimed composition is formulated (*i.e.*, in the formulation)," not when the components are isolated apart from one another.

2. **This Plain Language of the Claim Term Includes Its Own Express pH Parameters, Which Compare With Either (i) An Environment Having a pH of 5.5 or Less, or (ii) When the Composition is Formulated Without the pH Dependent Agent**

This claim term, unlike the preceding one (*i.e.*, non-pH dependent sustained release agent), includes an express pH parameter that defines the pH range in which the component will increase the release rate of the active agent in a pH-dependent manner, *i.e.*, "at a pH in excess of 5.5." However, the word "increase" indicates a comparison. The release rate of the active agent must increase with respect to something else, but that comparator is not stated in the claim.

There are two possibilities for the comparator in this case: (i) an increase in release over (*i.e.*, as compared to) the same formulation at pHs of 5.5 or less, or (ii) an increase in release over (*i.e.*, as compared to) the same formulation absent the pH-dependent agent. The '599 patent does not specify which, if either, is preferred. Rather, the invention makes it clear that either is correct.

- 12 -

First, the patent gives comparative examples (*i.e.*, controls) in which the pH-dependent component is omitted.  Table 1 indicates these as formulations PD0052-22A and PD0052-25B that "contain no ionic [*i.e.*, pH dependent] materials in the formulations.  These two formulations serve as a control."  (Ettinger Decl., Exh. 1, Table 1, Note.)  Accordingly, this indicates that a suitable comparator for "increases" would be compositions formulated without a pH-dependent component.

Next, the patent exemplifies dissolution at a pH below 5.5, *i.e.*, pH 1.2, and above 5.5, *i.e.*, pH 6.8.  (*See* Ettinger Decl., Exh. 1, Table 2, n.1, 2.)  Accordingly, this indicates that a suitable comparator for "increases" would be testing the same composition containing the same pH-dependent agent at a pH in excess of 5.5 and at a pH of 5.5 or less.

Neither of these comparators is at odds with the other.  Both serve the purposes of the invention, and both are exemplified.  Therefore, the formulated pH-dependent agent may meet either one of these criteria.

*Consequently, "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5" should be construed as meaning a substance that, when the claimed composition is formulated (i.e., in the formulation), increases the rate of release of the active agent (i.e., drug) from the composition in an environment having a pH above 5.5, over (i.e., as compared to) when the composition is either (i) in an environment having a pH of 5.5 or less, or (ii) when the composition is formulated without the pH-dependent agent.*

C.      "POLYMER THAT SWELLS AT A pH IN EXCESS OF 5.5"

The term "polymer that swells at a pH in excess of 5.5" should be construed as meaning a molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which, when the claimed composition is formulated (*i.e.*, in the formulation), expands at a pH above 5.5.  The polymer that swells is a type of pH-dependent agent that is discussed above in Section IV.B.  This term first appears in '599 patent claim 2, which reads as follows (emphasis added):

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1       2. The composition of claim 1 wherein said at least one pH dependent
2 agent is at least one **polymer that swells at a pH in excess of 5.5**.[6]

### 1.      "Polymer That Swells at a pH in Excess of 5.5" Should Also Be Construed as Describing Components When Actually Formulated, Not When Isolated

5      Since this claim term is found in claims that depend from independent claim 1 and is a

6 further limitation of the pH-dependent agent, the polymer that swells at a pH in excess of 5.5

7 must be evaluated "when the claimed composition is formulated (*i.e.*, in the formulation)," as

8 must the pH dependent agent of claim 1, not when the components are isolated apart from one

9 another.

### 2.      "Polymer" is a Scientific Term With a Dictionary Definition

11      POLYMER SCIENCE DICTIONARY (Mark S.M. Alger ed., Elsevier Science Publishers 1989)

12 ("Polymer Science"), as Remington's discussed above in Section IV.A.3, is the type of extrinsic

13 evidence that this Court should consider to explain either a scientific principle or the meaning of a

14 technical term. *See Markman*, 52 F.3d at 980. It defines the term "polymer" as a molecule with

15 many units joined to each other through chemical covalent bonds, often in a repeating manner.

16 (Ettinger Decl., Exh. 8.) The parties agree on this.

### 3.      The Plain Language of the Claim Provides the pH Range

18      This claim term expressly provides that the polymer, when in the claimed composition,

19 swells (*i.e.*, expands) at pH above (*i.e.*, in excess of) 5.5.

20      Therefore, within the field of the '599 patent, the '599 patent specification and the

21 language of the claims themselves provide that polymer's property of swelling or expanding must

22 be evaluated, not only "when the claimed composition is formulated (*i.e.*, in the formulation),"

23 but also with respect to the expressly claimed pH range of above 5.5.

### 4.      The Interpretation of This Claim Term Should Not Include an Exemplary List of Suitable Components, as Impax Proposes

26      It is unnecessary to list, in the interpretation of this claim term, examples of non-pH

27 dependent sustained release agents, as Impax proposes. One cannot point to any intention by the

---

[6] *Id.*

**PLAINTIFF'S OPENING
CLAIM CONSTRUCTION BRIEF
CASE NO. 10-CV-05467 RS (MEJ)**

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    inventors to limit their invention accordingly.  *See Phillips,* 415 F.3d at 1323; *Liebel-Flarsheim*,

2    358 F.3d at 906; *Prima Tek II*, 318 F.3d at 1151.  Such language would only be words that merely

3    exemplify how to practice an invention, such as "including, but not limited to" language. *Phillips*,

4    415 F.3d at 1323.

5    ***Accordingly, "a polymer that swells at a pH in excess of 5.5" means a molecule with***

6    ***many units joined to each other through chemical covalent bonds, often in a repeating manner,***

7    ***which, when the claimed composition is formulated (***i.e.***, in the formulation), expands at a pH***

8    ***above 5.5.***

9    **D.    "Agent That Increases the Solubility of Said Pharmaceutically**
       **Active Agent at a pH Greater Than 5.5"**

10

11   The term "agent that increases the solubility of said at least one pharmaceutically active

12   agent at a pH of greater than 5.5" should be construed as meaning a substance that, when the

13   claimed composition is formulated (*i.e.*, in the formulation), increases the amount of the active

14   agent (*i.e.*, drug) that dissolves in another substance in an environment having a pH above 5.5,

15   over (*i.e.*, as compared to) when the composition is either (i) in an environment having a pH of

16   5.5 or less, or (ii) when the composition is formulated without the agent that increases the amount

17   of the active agent (*i.e.*, drug) that dissolves in another substance.  The agent that increases the

18   solubility of the pharmaceutically active agent is a type of pH-dependent agent that is discussed

19   above in Section IV.B.  This term first appears in '559 patent claim 4, which reads as follows

20   (emphasis added):

21       4. The composition of claim 1 wherein said at least one pH dependent agent is at
          least one agent that increases the solubility of said at least one pharmaceutically
22        active **agent at a pH of greater than 5.5**.[7]

23

24

25

26

27

28   [7] *Id.*

**Plaintiff's Opening**
**Claim Construction Brief**
**Case No. 10-CV-05467 RS (MEJ)**

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1    **1.    "Agent that Increases Solubility of Said Pharmaceutically Active
2          Agent at a pH Greater than 5.5" Should Also Be Construed as
          Describing Components When Actually Formulated, Not When
3          Isolated**

4    Since this claim term is found in claims that depend from independent claim 1 and is a

5    further limitation of the pH-dependent agent, the agent that increases solubility must be evaluated

6    "when the claimed composition is formulated (*i.e.*, in the formulation)," as must the pH

7    dependent agent of claim 1, not when the components are isolated apart from one another.

8    **2.    The Plain Language of the Claim Term Includes Its Own Express pH
          Parameters Which Must Compare With Either (i) an Environment
9          Having a pH of 5.5 or Less, or (ii) When the Composition is
          Formulated Without the pH-Dependent Agent**

10

11   This claim term includes an express pH parameter that defines the pH range in which it

12   will increase the solubility the active agent, *i.e.*, "at a pH greater than 5.5." However, the word

13   "increase" indicates a comparison, as it does in the term "pH dependent agent that increases . . ."

14   discussed above in Section IV.B.2. The solubility of the active agent must increase with respect

15   to something else, but that comparator is not stated in the claim.

16   Again, there are two possibilities for the comparator in this case: (i) an increase over (*i.e.*,

17   as compared to) the same formulation absent the pH-dependent agent, or (ii) an increase over

18   (*i.e.*, as compared to) the same formulation at pHs of 5.5 or less. The '599 patent does not specify

19   which, if either, is preferred, but the invention makes it clear that either is correct for the reasons

20   detailed above in Section IV.B.2. The patent gives comparative examples in which the pH-

21   dependent component is omitted, and the patent exemplifies dissolution at a pH below and above

22   5.5. (*See* Ettinger Decl., Exh. 1, Table 2, n.1, 2.) Accordingly, this indicates that a suitable

23   control or comparator for "increases" would be testing the same composition containing the same

24   pH-dependent agent at a pH in excess of 5.5 and at a pH of 5.5 or less.

25   Neither of these comparators is at odds with the other. Both serve the purposes of the

26   invention, and both are exemplified. Therefore, the formulated agent that increases solubility

27   must meet either one of these criteria.

28

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

3.      **Common Meaning and the Patent Explain That "Solubility" is Dissolution**

"Solubility" is commonly defined as "the amount of a substance that will dissolve in a given amount of another substance."  *See* Merriam Webster's Collegiate Dictionary 1119 (10th ed. 1994).  (Ettinger Decl., Exh. 9.)

The '599 patent does not use "solubility" in any manner inconsistent with its common meaning.  The '599 patent explains that "[t]he rate at which a drug goes into solution when it is dissolved in a medium is proportional to the solubility of the drug on the medium."  (Ettinger Decl., Exh. 1, col. 1, ll. 17-19.)  The patent also includes an example in which "[t]he solubility of anagrelide HCl in aqueous solutions" was tested.  (*Id*. at col. 5, ll. 41-44.)  The test method measured solubility by dissolution studies.  (*Id*. at col. 7, ll. 1-2; *see also id*. at col. 4, ll. 60-61.)

4.      **The Interpretation of This Claim Term Should Not Include an Exemplary List of Suitable Components, as Impax Proposes**

It is unnecessary to list, in the interpretation of this claim term, examples of non-pH dependent sustained release agents, as Impax proposes.  One cannot point to any intention by the inventors to limit their invention accordingly.  *See Phillips,* 415 F.3d at 1323; *Liebel-Flarsheim*, 358 F.3d at 906; *Prima Tek II*, 318 F.3d at 1151.  Such language would only be words that merely exemplify how to practice an invention, such as "including, but not limited to" language. *Phillips,* 415 F.3d at 1323.

*Accordingly, the term "agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5" means a substance that, when the claimed composition is formulated (**i.e., in the formulation**), increases the amount of the active agent (**i.e., drug**) that dissolves in another substance in an environment having a pH above 5.5, over (**i.e., as compared to**) when the composition is either (i) in an environment having a pH of 5.5 or less, or (ii) when the composition is formulated without the agent that increases the amount of the active agent (**i.e., drug**) that dissolves in another substance.*

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

E.   **"REDUCING THE LIKELIHOOD OF SIDE EFFECTS ASSOCIATED WITH THE ADMINISTRATION OF GUANFACINE"**

The term "reducing the likelihood of side effect associated with guanfacine administration" should be construed as meaning reducing the probability of side effects resulting from guanfacine administration.  This term first appears in '794 patent claim 8, which reads as follows (emphasis added):

> 8. A method of **reducing the likelihood of side effects** associated with the administration of guanfacine, comprising administering to a patient a therapeutically effective amount of a the position comprising (a) at least one pharmaceutically active agent that is pH dependent, said pharmaceutically active agent being guanfacine or guanfacine hydrochloride; (b) at least one non-pH dependent sustained release agent selected from the group consisting of ethylcellulose, celluipse acetate, vinyl acetate/vinyl chloride copolymers, acrylate/methacrylate copolymers, polyethylene oxide, hydroxynropyl methylcellulose, carageenan, glainic acid and salts thereof, hydroxyethyl cellulose, hydroxypropyl cellulose, karaya gum, acacia gum, tragacanth gum, locust bean gum, guar gum, sodium carboxymethyl cellulose, methyl cellulose, beeswax, carnauba wax, cetyl alcohol, hydrogenated vegetable oils, and stearyl alcohol; and(c) at least one pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from a tablet dosage form at a pH in excess of 5.5.[8]

1.   **The Common Meaning of "Likelihood" is Probability**

"Likelihood" is commonly defined as "probability."  *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 673 (10th ed. 2002).  (Ettinger Decl., Exh. 10.)  The '794 patent does not use "likelihood" in any manner inconsistent with its common meaning.  Rather, the patent distinguishes the "likelihood" of side effects from the number of side effects.  "When guanfacine hydrochloride is administered as part of a composition in accordance with the present invention, there is a reduction in the number of side effects associated with the administration of guanfacine hydrochloride, or a reduction in the likelihood of side effects associated with the administration of guanfacine hydrochloride."  (*See* Ettinger Decl., Exh. 2, col. 3, ll. 50-55.)  "When anagrelide is administered as part of a composition in accordance with the present invention, there is a reduction in the number of side effects associated with the administration of anagrelide, or a

---

[8] Ettinger Decl., Exh. 2.

PLAINTIFF'S OPENING
CLAIM CONSTRUCTION BRIEF
CASE NO. 10-CV-05467 RS (MEJ)

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1   reduction of the likelihood of side effects associated with the administration of anagrelide." (*Id.*

2   at col. 4, ll. 21-26.)

3        ***Accordingly, the term "reducing the likelihood of side effects associated with the***

4   ***administration of guanfacine" means reducing the probability of side effects resulting from***

5   ***guanfacine administration.***

6   **V.    CONCLUSION**

7        For the reasons above, Shire respectfully requests the Court to construe:

8        (1) "non-pH dependent sustained release agent" to mean a substance that, when the

9   claimed composition is formulated (*i.e.*, in the formulation), slows release of the active agent (*i.e.*,

10   drug) from the composition over an extended period of time regardless of gastrointestinal pH;

11        (2) "pH dependent agent that increases the rate of release of said at least one

12   pharmaceutically active agent from the tablet at a pH in excess of 5.5" to mean a substance that,

13   when the claimed composition is formulated (*i.e.*, in the formulation), increases the rate of release

14   of the active agent (*i.e.*, drug) from the composition in an environment having a pH above 5.5,

15   over (*i.e.*, as compared to) when the composition is either (i) in an environment having a pH of

16   5.5 or less, or (ii) when the composition is formulated without the pH-dependent agent;

17        (3) "polymer that swells at a pH in excess of 5.5" to mean a molecule with many units

18   joined to each other through chemical covalent bonds, often in a repeating manner, which, when

19   the claimed composition is formulated (*i.e.*, in the formulation), expands at a pH above 5.5;

20        (4) "agent that increases the solubility of said at least one pharmaceutically active agent at

21   a pH of greater than 5.5" to mean a substance that, when the claimed composition is formulated

22   (*i.e.*, in the formulation), increases the amount of the active agent (*i.e.*, drug) that dissolves in

23   another substance in an environment having a pH above 5.5, over (*i.e.*, as compared to) when the

24   composition is either (i) in an environment having a pH of 5.5 or less, or (ii) when the

25   composition is formulated without the agent that increases the amount of the active agent (*i.e.*,

26   drug) that dissolves in another substance;

27        (5) "reducing the likelihood of side effects" to mean reducing the probability of side

28   effects resulting from guanfacine administration;

1    (6) "agent that maintains an acidic microenvironment in the composition" to mean a

2    substance that keeps acidic, over a period of time, the environment immediately around or in

3    close proximity to the active agent (*i.e.*, drug) inside of the composition;

4    (7) "binding agent" to mean a substance that aids in the binding of ingredients in a tablet;

5    (8) "an amount effective to treat said attention deficit disorder or attention deficit with

6    hyperactivity disorder in said patient" to mean an amount of the composition sufficient to

7    eliminate or reduce one or more symptoms of attention deficit disorder or attention deficit with

8    hyperactivity disorder, whether during a single application of the amount or repeated applications;

9    and

10    (9) "a therapeutically effective amount of a the position [sic, composition]" to mean an

11    amount of the composition effective to improve an undesirable condition.

12    DATED: _____March 30, 2012_____        MCDERMOTT WILL & EMERY LLP

13

14                            By:       _____*/s/ Joseph R. Robinson*_____

                                          Joseph R. Robinson

15                                  *Attorneys for Plaintiffs*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK